## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HEATHER HOEKSTRA, | |
| Plaintiff, | Case No. 22 C 3615 |
| v. | Honorable Sunil R. Harjani |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Heather Hoekstra has worked for Ford Motor Company at the Chicago Stamping Plant in Chicago Heights, Illinois, since 1996. Hoekstra asserts she was subject to sex discrimination based on verbal and physical harassment in August and October 2021. She claims that Ford also failed to provide a reasonable accommodation for her disability by retracting her last employment position in November 2021. Hoekstra further alleges she was subject to retaliation for complaining about sexual harassment because, after she reported incidents to Ford management, her position was terminated, and she was placed back on "no work available" status. For the reasons explained below, Hoekstra has failed to create a genuine dispute of material fact and judgment may be entered as a matter of law. Accordingly, the Court grants Ford's motion for summary judgment on all of Hoekstra's claims.

## Statement of Facts[1]

The Court construes the evidence in the summary judgment record and draws all reasonable inferences in Plaintiff's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ford, a motor vehicle manufacturer, hired Hoekstra to work at the Chicago Stamping Plant in August 1996 as an hourly employee. Compl. [5] ¶ 8; PRDSOF ¶¶ 1,6.[2] Hoekstra was first diagnosed as disabled in 2016. PRDSOF ¶ 9.[3] In January 2017, Hoekstra went on "no work available" leave because she was not able to perform her job as an Inspector in the Assembly department due to her medical restrictions. *Id.* at ¶¶ 11, 41. Hoekstra's medical restriction included no lifting over ten pounds,

---

[1] Hoekstra filed a Response to Ford's Statement of Material Facts as required by Local Rule 56.1(b)(2). Ford argues that the Court should disregard the Hoekstra's Response Statement of Material Facts in its entirety and deem admitted Ford's Statements of Material Facts for failure to comply with LR 56.1(e)(3). Hoekstra's Response Statement of Material Facts is abysmal. Hoekstra did not respond to multiple paragraphs (*see* PRDSOF ¶¶ 47, 52, 69) and included unintelligible and inappropriate answers (*see* PRDSOF ¶ 30 "Admission that Ford waited till the end to seek to find her an eligible job – what crap" (cleaned up), ¶ 55 "True???."). The Court exercises its discretion and deems these statements of fact admitted. *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("The decision whether to apply the [local] rule[s] strictly or to overlook any transgression is one left to the district court's discretion."). Hoekstra further disputes facts without citation to the record, adds allegations into responses without citation to the record, and contests parts of factual statements while remaining silent as to the remainder. *See e.g.*, PRDSOF ¶ 5 ("Disputed. The Rebecca Tayler [*sic*] letter to Hoekstra puts paid to this."), ¶ 6 ("It is undisputed that Hoekstra was an hourly employee. The impact of the Taylor letter is unknown in this context."), ¶ 17 ("Undisputed that the project took years; nothing about what Heather was doing,"), ¶ 23 ("Disputed. Then why did R Taylor assign HH to the Crib?), ¶ 50 ("Undisputed but Plaintiff notes that: "at the time" means that Ford did nothing to identify a job during the entire time they worked to eliminate her."), ¶ 56 ("Disputed. The jobs that plaintiff thought of were already filled or Pipkins told her that the jobs were not within her restrictions. There was no "independent" monitor to confirm his statements.") (cleaned up). The Court exercises its discretion and declines to disregard the entirety of Hoekstra's Response to Ford's Statement of Material Facts. Though Hoekstra's responses fail to properly cite to the record, and were often bewildering, the Court takes the facts in the light most favorable to Hoekstra and reads the facts as disputed unless indicated otherwise.

[2] The Court has taken the facts from the parties' Local Rule 56.1 statements. Unless otherwise noted, the following facts are not in dispute. The Court cites to Defendant's LR 56.1 statement of facts as "DSOF" and Plaintiff's response to Defendant's LR 56.1 statement of facts as "PRDSOF." Plaintiff did not provide a statement of additional facts pursuant to LR 56.1(b)(3).

[3] Hoekstra disputes what caused the disability but not the disability status or the timing of the disability diagnosis. PRDSOF ¶ 9.

2

maximum occasional lift/carry ten pounds, maximum frequent lift/carry five pounds, maximum constant lift/carry two pounds, no pushing/pulling >40 pounds, no stooping, no kneeling or crawling, and no air chisels or palm nailers. *Id.* at ¶¶ 10[4], 29. Inspectors look over parts for flaws and quality concerns. *Id.* at ¶¶ 36, 52,[5] 54. The daily job duties require Inspectors to regularly stoop and lift parts frequently weighing over five pounds from racks to place on fixtures and check measurements. *Id.* at ¶¶ 37-38, 54. The parts inspected at the Chicago Plant – hoods, doors, rear header inners, D-pillars, and roof rail assemblies – often weigh over ten pounds. *Id.* at ¶¶ 36-38, 54. Inspectors also conduct non-destruct tests – where vibration tools such as air chisels or palm nailers are used to check a part's integrity. *Id.* at ¶ 39. Hoekstra admits that she cannot perform these essential daily functions of the Inspector job with her restrictions. *Id.* at ¶ 41.

The Chicago Plant is a unionized workforce, and during her employment with Ford, Hoekstra was a member of the UAW holding an Inspector classification. DSOF ¶ 4; Doc. [69], Hoekstra Dep. 25:11-16.[6] Pursuant to the agreements, hourly employees generally are awarded a classification through a "bid" process and receive jobs based on factors such as seniority, merit/qualifications, and disciplinary and attendance record. DSOF ¶ 5.[7]

---

[4] Hoekstra response to this paragraph – "Disputed. The correct date is October 2017." – does not cite to or provide any information regarding how the alleged medical restrictions are incorrect. PRDSOF ¶ 10. Later, Hoekstra does not dispute that she updated her medical restrictions which included the same restrictions listed above. PRDSOF ¶ 29. These restrictions are further supported by Hoekstra's deposition where she agrees that the medical restrictions issued in connection with her work are laid out as detailed above. Doc. [69] at 134:1-135:14 (*citing* Doc. [50] at C-2), 171:4-24 (*citing* Doc. [50] at C-3).

[5] As noted above, Hoekstra failed to respond, and this paragraph is deemed admitted. *See supra*, n.1.

[6] Hoekstra objects to the fact that there are collective bargaining agreements that govern the terms and conditions of employment. PRDSOF ¶ 4 ("Argumentative and Disputed. Ford never called or proposed to call a UAW 'official' to support this allegation.") This objection is overruled and the fact is found undisputed. Hoekstra admits in her deposition to being a member of UAW and that her employment terms are subject to the collective bargaining agreement. Doc. [69], Hoekstra Dep. 25:11-16.

[7] Hoekstra again notes this paragraph is disputed because of the "Rebecca Taylor letter," which offered Hoekstra the temporary Crib attendant job. PRDSOF ¶ 5. However, this letter does not discuss the general

3

In October 2017, Hoekstra came back from "no work available" leave to assist with an extensive project that was within her medical restrictions. *Id.* at ¶ 14. The Chicago Plant has a place called the "Crib," which is a storage facility for non-production inventory and parts, such as safety equipment. *Id.* at ¶ 12. Hoekstra was given a position in the Crib to help relocate and consolidate supplies into a singular area. *Id.* at ¶ 14. The parties dispute whether this assignment was a temporary or a permanent position. *Id.* at ¶¶ 15-16. However, Hoekstra maintained her Inspector classification throughout her work in the Crib (which was a full-time position) as she was not reclassified as a Crib attendant. *Id.* at ¶¶ 15-16; Doc. [69], Hoekstra Dep. 45:3-46:3. Hoekstra's assignment ended in October 2021 after the remaining daily tasks for this assignment failed to justify a full-time hourly position. DSOF ¶ 22[8]; PRDSOF ¶¶ 21, 28. Hoekstra then opted to take a temporary layoff effective through November 18, 2021. PRDSOF ¶ 28.

After returning from the temporary layoff in November 2021, the Human Resources department began the Medical Restriction Placement Process to help find Hoekstra a new job within her restrictions. *Id.* at ¶ 30.[9] As part of the placement process, management in Assembly (Hoekstra's department) reviewed her medical restrictions and was unable to identify any available jobs that Hoekstra could perform. *Id.* at ¶¶ 35, 41-42. Hoekstra admitted that she cannot perform

---

way in which hourly employees receive a job. Thus, given her citation is not responsive to the asserted facts, they are deemed admitted.

[8] Hoekstra agrees that the tasks she was performing did not justify a full-time hourly employee, but disputes that there was no longer a logical business justification for maintaining and funding a Temp Crib position. *See* PRDSOF ¶¶ 21-22. In support, Hoekstra does not cite to any evidence and only writes that "R Taylor thought apparently, differently in her letter to Hoekstra." *Id.* at ¶ 22. An offer of a position does not negate that there could be, four years later, a logical business justification for terminating the position, such as when the tasks do not justify a full-time employee.

[9] As noted above, Hoekstra's response was inappropriate. Hoekstra did not admit or deny the allegation but instead responded with the commentary: "Admission that Ford waited till the end to seek to find her an eligible job – what crap." PRDSOF ¶ 30. As Hoekstra failed to properly dispute this fact with any evidence it was deemed admitted. *See supra*, n.1.

the essential job functions of an Inspector classification. *Id.* at ¶¶ 41-42. Even if Hoekstra returned to her previously held production classification, all these jobs would also violate her medical restrictions. *Id.*

As part of the next step of the placement process, Hoekstra suggested employment positions. *Id.* at ¶ 44.[10] Hoekstra requested that she be allowed to continue working in the Crib or given another position within her medical restrictions. *Id.* at ¶¶ 44, 47.[11] No such position was available: (1) the Crib assignment was no longer available; (2) Hoekstra could not perform an inspector or production role with her restrictions; (3) there were no desk or "light duty" roles available; and (4) the Inspector Pressroom assignment included functions not within her medical restrictions. *Id.* at ¶¶ 30, 35, 41-42, 46-49,[12] 51-52, 54. Thus, Hoekstra remained on "no work available" leave. *Id.* at ¶¶ 29-30, 34-35.

Hoekstra also alleges she was subject to sexual harassment during her time at the Chicago Plant. On August 25, 2021, Hoekstra reported the first incident via a text message complaint to her supervisor, Dana Shalitis. *Id.* at ¶ 59. Hoekstra alleged that a Black tow driver who worked in Material Handling hollered at her: "Whooo Baby; get home, you're too pretty to work here." *Id.* Ford investigated Hoekstra's complaint by interviewing multiple employees. *Id.* at ¶¶ 60, 62-63. After the investigation, Ford was unable to positively identify the alleged perpetrator or

---

[10] Hoekstra disputes this paragraph by espousing on how Ford was lax in looking for a replacement position for Hoekstra but does not dispute that she was also supposed to identify potential available jobs she could perform. PRDSOF ¶ 44.

[11] As noted above, Hoekstra's failed to respond, and this paragraph is deemed admitted. *See supra*, n.1.

[12] Hoekstra disputes paragraph 48, noting that "Ford did not look for a position until after Hoekstra left." PRDSOF ¶ 48. However, Hoekstra does not dispute that there were no jobs available for Hoekstra in a desk job or light duty job. *Id.* at ¶¶ 48-49.

substantiate Hoekstra's complaint. *Id.* Hoekstra never experienced additional encounters with the unidentified tow driver. *Id.* at ¶ 64.

Approximately five months later, on January 5, 2022, Hoekstra complained of multiple other incidents to Ford via email. *Id.* at ¶ 65.[13] First, Hoekstra raised an administrative incident from 2020 where supervisors failed to close out her time-record sheets, which required her to ask supervisor Zivadin Marjanovich for pay corrections. *Id.* at ¶¶ 65, 67. He did so without any comment. *Id.* at ¶ 67. Second, Hoekstra contends that around July 2021, Marjanovich was discussing her attendance and commented that he "wouldn't want to fire [Hoekstra]." *Id.* at ¶¶ 65, 68. There was nothing sexual about this interaction and the only basis for Hoekstra's belief that this was sexual harassment was that Hoekstra was female and Marjanovich was male. *Id.* at ¶¶ 65, 69.[14] Third, on October 4, 2021, supervisor Shalitis instructed all employees in the Crib, Material Handling, and receiving checkers to report to Material Handling for 5 a.m. check-in. *Id.* at ¶¶ 65, 70. Hoekstra felt this was harassing because it followed her report of sexual harassment from a material handling tow driver. *Id.* at ¶ 65. Hoekstra attended one check-in. *Id.* at ¶ 72. Fourth, on her way to her only check-in, Hoekstra testified that she asked supervisor Kurt Rodriguez where the check-in was located. *Id.* at ¶ 65. In response, Rodriguez grabbed and squeezed her arm while giving directions. *Id.* Fifth, Hoekstra was told by Shalitis to wait until 3:30 p.m. for a check-out

---

[13] Hoekstra unintelligibly disputes paragraph 65. *See* PRDSOF ¶ 65 ("Disputed. Plaintiff was instructed by Shalitis on October 4, 2021, acknowledged by an email she sent to Shalitis. The following day, October 5, 2021, [Marjanovich] apparently put plaintiff out of work through an email to Shalitis. The incident occurred on October 7, 2021. Plaintiff opposed Shalitis about the morning check-in meeting and was put out of work the next day by either [Marjanovich] or Pat McCulligan on October 5. Email.") (cleaned up). Hoekstra does not appear to dispute that these incidents occurred and were reported on January 5, 2022 by email. Instead, Hoekstra appears to dispute when she was instructed of the new check-in location, that she opposed that change, and the subsequent change of job status.

[14] As noted above, the paragraph was not responded to and thus deemed admitted. *See supra*, n.1.

time to prevent all employees from taking breaks at the end of the shift. *Id.* at ¶ 65, 76. Hoekstra admits this was not a form of harassment. *Id.* at ¶ 75.[15] Sixth, Hoekstra was temporarily laid off from October 7 to November 18, 2021, after which time she was placed on "no work available leave." *Id.* at ¶¶ 28-30, 65. Hoekstra believes that she was placed on "no work available" status in retaliation for her complaints. Compl. [5] ¶¶ 36-37. After receiving these complaints, the Chicago Plant's Labor Relations team investigated. PRDSOF ¶ 66. They conducted interviews with numerous employees and reminded supervisors of the anti-harassment policy that was in place. *Id.* The investigation could not substantiate any of the above allegations. *Id.*

## Discussion

Hoekstra brings three causes of action in this case: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 for the physical and verbal conduct she was subjected to; (2) failure to accommodate her disability by eliminating her position in violation of the Americans with Disabilities Act; and (3) retaliation for placing her on "no work available" leave after she engaged in the statutorily protected activity of reporting sexual harassment under Title VII. Defendant moves for summary judgment on all three counts.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby*, 477 U.S. at 249.

---

[15] Hoekstra does not dispute this fact. However, she attempts to include additional allegations: "other employees were leaving the work area before 3:30 and were being paid for 10 hours. [Plaintiff] told "Ziggy" this and became the subject of scrutiny and lost her 3:10 break." PRDSOF ¶ 75. There is no evidence cited supporting this allegation and it is disregarded.

**Count I: Sex Discrimination**

Hoekstra initially claims that she was subject to verbal and physical harassment in August and October 2021.  To sustain a claim under Title VII, a plaintiff must prove: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 862 (7th Cir. 2011).  Ford argues that Hoekstra: (1) failed to allege actionable severe or pervasive conduct; and (2) cannot establish employer liability.

The Court must initially determine whether the harassment was severe or pervasive enough to create a hostile work environment.  Courts "consider the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id*. (cleaned up).  The Seventh Circuit instructs courts to "assume employees are generally mature individuals with thick skin that comes from living in the modern world." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018).  "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Id.*  In reviewing, the Court looks at the totality of the circumstances to determine if everything combined constitutes a hostile or abusive environment. *Id.*

Ford contends that multiple instances of alleged harassment do not include evidence that they were offensive, sexual in nature, or based on Hoekstra's sex.  To support a hostile work environment claim under Title VII, Hoekstra must show that the challenged conduct had a sexual character or purpose. *See e.g.*, *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011).  In this case, as certain incidents did

not have a sexual character or purpose, they cannot support a claim of sex discrimination. It is undisputed all employees – male and female – were told to report to the new morning check-in location. PRDSOF ¶ 70. Additionally, the 2020 administrative timesheet issue was corrected by Marjanovich without any comment. *Id.* at ¶¶ 65, 67. Marjanovich's later comment about not wanting to fire Hoekstra came after a discussion about her attendance. *Id.* at ¶ 68. At no point was the conversation offensive, sexual in nature, or included comments about Hoekstra's sex. *Id.* at ¶ 69. Hoekstra's only basis for believing this was sexual harassment was that she is female and Marjanovich is male. *Id.* Hoekstra also admits that her regular shift is from 5:00 a.m. to 3:30 p.m. and that being instructed to wait until 3:30 p.m. for check-out was not a form of harassment. *Id.* at ¶¶ 65, 75. Nothing in the record establishes that the above conduct was motivated by or had anything to do with sex. *See Vance*, 646 F.3d at 470. This evidence fails to support Hoekstra's Title VII claim.

Even taking all facts in the light most favorable to Hoekstra, the environment at Ford was not permeated with sexism sufficiently severe or pervasive to create a hostile work environment. *See e.g.*, *Swyear*, 911 F.3d at 881-82. The alleged harassing conduct that has a sexual connotation can be summarized, at best, as: (1) a tow driver hollering "Whooo Baby; get home, you're too pretty to work here" (PRDSOF ¶ 59); (2) reassignment of all employees' check-in locations to a location where Hoekstra had allegedly experienced sexual harassment (*id.* at ¶¶ 65, 70, 72); and (3) Rodriguez squeezing her arm while giving her directions to morning check-in (*id.* at ¶ 65). Seventh Circuit precedent instructs that these incidents, even in combination, do not meet the high bar of creating an abusive work environment based on their infrequency and relative innocuity. *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024).

The Seventh Circuit analysis in *Anderson* is instructive. *Id.* at 652. *Anderson* centered around an employee who was subject to multiple incidents of alleged sexual harassment: (1) a coworker touching her inappropriately by grabbing her butt once and hugging her multiple times; (2) the bar manager calling her a "bitch"; and (3) the co-owner and general manager telling the employee to wear tight, form-fitting clothing. *Id.* The Seventh Circuit affirmed the grant of defendant's motion for summary judgment as plaintiff had failed to prove these isolated incidents affected the terms and conditions of employment. *Id.* The Seventh Circuit also noted that, "[w]hile unfortunate, such off-color comments, isolated incidents, teasing, and other unpleasantries are not enough for a Title VII sexual harassment claim." *Id.* (cleaned up).

Here, the tow driver commenting on how Hoekstra was "too pretty to work here," while completely inappropriate, is a singular off-color comment similar to the "bitch" comment in *Anderson*. *Id.* Further, Hoekstra did not have any other encounters with this employee, and it is an isolated incident. There is also no evidence that the change of check-in location for *all* employees was made specifically because of Hoekstra's harassment complaint and was meant to discriminate against her. The Rodriguez incident where he squeezed Hoekstra's arm while giving her directions, while also improper, occurred once. *Id.* "[A]n isolated touch on the shoulder and one crude insult are not objectively severe or pervasive enough to be actionable under Title VII." *Davis v. Papa John's USA, Inc.*, 2021 WL 5154105, at *2 (7th Cir. 2021). These three alleged unconnected incidents and the absence of any other serious sexual harassment incidents support the Court's conclusion that no reasonable jury could find that the conduct was severe or pervasive.

Ford's second argument is that Hoekstra has not proven a basis for employer liability. *Overly*, 662 F.3d at 862. An employer can be held responsible for the conduct of coworkers if it "knew or should have known" about the harassment and failed to take reasonable steps to remedy

the harassment once on notice. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). An employer avoids liability if it promptly investigates the complaint and take steps reasonably likely to stop the harassment. *Porter v. Erie Foods Int'l., Inc.*, 576 F.3d 629, 636-37 (7th Cir. 2009); *see also Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 731-32 (7th Cir. 2009). Here, Ford took steps to investigate each and every complaint brought by Hoekstra, including following up with Hoekstra on multiple occasions and interviewing numerous employees. PRDSOF ¶¶ 60, 63, 66. None of the allegations were substantiated. *Id.* In assessing the corrective action, the Court focuses not on whether the perpetrators were punished, but "whether the employer took reasonable steps to prevent future harm." *Porter*, 576 F.3d at 637. Ford took reasonable steps to protect Hoekstra and other employees from future harassment, including by investigating the claims and reminding employees of Ford's anti-harassment policy, which discharged its legal duty. PRDSOF ¶ 66; *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 976 (7th Cir. 2004) ("If an employer takes reasonable steps to discover and rectify the harassment of its employees ... it has discharged its legal duty."). Since the investigation, Hoekstra has not experienced any additional incidents of this nature. PRDSOF ¶ 64.

Ford's final contention is that, even if Hoekstra could show a hostile work environment claim based on supervisor conduct, the *Faragher/Ellerth* affirmative defense applies. Employers face strict liability for a supervisor's harassment if it culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment connected to the alleged harassment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 744-45 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). If there was no tangible employment action, then an employer avoids strict liability provided: "(1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the plaintiff employee unreasonably failed to take

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 628 (7th Cir. 2019). Hoekstra does not address this argument at all in her response brief, and her failure to address this issue constitutes a waiver, providing another basis to grant summary judgment in Ford's favor. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022).

### Count II: Failure to Accommodate

Hoekstra next asserts that Ford failed to accommodate her disability. Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations" unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5); *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1053 (7th Cir. 2024). Recovery under a failure to accommodate theory requires proof that: "(1) the employee was a qualified individual with a disability; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability." *Conners v. Wilkie*, 984 F.3d 1255, 1260-61 (7th Cir. 2021). Ford does not contest that Hoekstra was disabled and that they were aware of her restrictions. Instead, Ford argues Hoekstra fails to show the first and third elements of a failure to accommodate claim.

### Qualified Individual

The ADA defines "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine if an employee is a qualified individual, courts "first consider whether the individual satisfies the prerequisites for the position and then turn to the question of whether the individual can perform the essential

functions of the job with or without reasonable accommodation." *Smithson v. Austin*, 86 F.4th 815, 820 (7th Cir. 2023). Within this analysis, courts must consider whether a particular duty is an essential function of the job. *Id*. This inquiry involves consideration of many factors including, "the employer's judgment, the employee's written job description, the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Id*.

Ford contends that Hoekstra is not a qualified individual because at the time she went on "no work available" leave, she was unable to perform the essential functions of the Inspector position with or without reasonable accommodation. In opposing summary judgment, Hoekstra appears to maintain that she was a qualified individual and could perform the essential functions of her Inspector job by working in a different area – the Pressroom. Doc. [62] at 2-3.

First, to determine whether Hoekstra could perform the essential functions of her job without reasonable accommodation, the Court considers the duties of her Inspector position and her condition at the time of her "no work available" leave. *See Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998) (the "determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision."); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (to "be protected under the ADA, [plaintiff] must be qualified to do the job and, with reasonable accommodations for his disability, *be able to perform the essential functions of that job which he currently holds*.") (emphasis in original). Hoekstra has failed to raise a genuine issue of material fact regarding whether she was able to perform the essential functions of the Inspector position without a reasonable accommodation at the time of her initial "no work available" leave. The parties agree that Hoekstra went on leave in January 2017 because she was unable to perform her job as an Inspector with her medical

restrictions and there were no other available jobs in the department that Hoekstra could perform despite her restrictions. PRDSOF ¶¶ 10-11. Hoekstra does not dispute that she was unable to perform essential functions of an Inspector with her work restrictions. *Id.*; *Conners*, 984 F.3d at 1261-62 (courts "presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary.").

Second, Hoekstra contends that she could perform the essential functions of her Inspector job with an accommodation to a different department called the Pressroom. But no reasonable jury could find on this record that Hoekstra could perform the essential functions of the Inspector position even in the Pressroom with a reasonable accommodation. It is Hoekstra's "burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Hoekstra must also show that she requested an accommodation disability. *Stelter v. Wisconsin Physicians Serv. Ins. Corp.*, 950 F.3d 488, 491 (7th Cir. 2020). In November 2021, after returning from temporary layoff, Human Resources began the placement process to find a job Hoekstra could perform with her restrictions. PRDSOF ¶¶ 30, 35. Ford was unable to identify any available jobs that Hoekstra could perform with restrictions. *Id.* Hoekstra does not dispute that, as part of the essential job duties, all Inspectors stoop and frequently lift parts that weigh over five pounds to place parts on fixtures and check measurements. *Id.* at ¶¶ 36-38, 40-41, 54. The parts include numerous hoods, doors, rear header inners, D-pillar, and roof rail assemblies that weigh more than ten pounds. *Id.* at ¶ 38. Inspectors also must be able to operate a palm nailer and air chisel to break and inspect welds to review the part's integrity. *Id.* at ¶ 39. Hoekstra admits she cannot perform the essential functions of an Inspector with her medical restrictions. *Id.* at ¶ 41. Furthermore, Inspectors in the Pressroom in particular are

responsible for conducting inspections, which involves lifting panels and parts weighing over ten pounds. *Id.* at ¶¶ 52, 54. Even though Hoekstra requested an accommodation to the Pressroom department, her claim fails because the proposed accommodation would violate her medical restrictions.

As Hoekstra could not perform the essential functions of her job with or without reasonable accommodation, a reasonable jury could not conclude on this record that Hoekstra was a qualified individual when she was terminated.

## Iterative Process

The Court turns to the third element of Hoekstra's *prima facie* case for failure to accommodate. Ford argues that it did not deny Hoekstra a reasonable accommodation for her restrictions because no such accommodation existed at the time Hoekstra was placed on "no work available" leave. A "reasonable accommodation" is one that allows the disabled employee to "perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Upon receiving an accommodation request, the ADA requires an employer to "engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (cleaned up). "An employer is not obligated to provide an employee the accommodation [s]he requests or prefers." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996).

Upon first being notified of her disability, Ford placed Hoekstra on "no work available" leave because she was unable to perform her Inspector job with her medical restrictions. PRDSOF ¶¶ 10-11, 40-41. However, Hoekstra returned from "no work available" leave to assist with an extensive Crib project, relocating and consolidating items into a single location. *Id.* at ¶ 14. Hoekstra was not classified as a Crib attendant during her stint but maintained her Inspector

classification. Doc. [69], Hoekstra Dep. 45:3-46:3. As noted above, it is disputed whether this position was temporary or permanent, but Hoekstra remained in this position until October 2021 and then went on voluntary layoff. *Id.* at ¶¶ 15, 21, 28. Upon return from voluntary layoff, in November 2021, Hoekstra requested that she be allowed to continue working in the Crib or given another position within her medical restrictions. *Id.* at ¶¶ 30, 35, 41-42, 46-49, 51-52, 54. No such position was available. *Id.* This evidence demonstrates that Defendant engaged in the interactive process with Hoekstra.

Hoekstra vaguely mentions reassignment in her response brief. A reasonable accommodation under the ADA may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). It is Hoekstra's "burden to prove that there was a vacant position for which she was qualified" at the time of her "no work available" leave. *Conners*, 984 F.3d at 1262; *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 482 (7th Cir. 2017). Hoekstra's request to transfer to another position fails because she has not identified any evidence establishing that positions were vacant for which she was qualified during the relevant period of her "no work available" leave, which is her burden to meet. On the other hand, Ford has presented undisputed evidence establishing that there were no open positions at the Chicago Plant within Hoekstra's medical restrictions in November 2021. PRDSOF ¶¶ 41-42. Because Hoekstra has failed to point to evidence that Ford had a vacant position for which she was qualified at the time of leave, reassignment to another position within her medical restrictions was not a reasonable accommodation and thus, not required under the ADA. Specifically, the undisputed evidence in the record shows that Ford looked for other positions for Hoekstra and there were no vacant positions available that complied with her medical restrictions in November 2021. *Id.* at ¶¶ 30, 35, 41-42, 46-49, 51-52, 54. The Crib assignment was no longer available because it is undisputed

16

that there was a legitimate business reason for eliminating the position; Hoekstra could not perform an inspector or production role with her restrictions; there were no desk or "light duty" roles available; and the Pressroom assignment included functions not within her medical restrictions. *Id.* at ¶¶ 21-22, 30, 35, 41-42, 46-49, 51-52, 54. It is Hoekstra's burden to show that other positions were available but not offered to her, which she has failed to do. *Anderson v. Lawrence Hall Youth Servs.*, 2024 WL 1342586, at *2 (7th Cir. 2024), *reh'g denied*, 2024 WL 1979971 (7th Cir. May 3, 2024).

In addition, "employers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 855-56 (7th Cir. 2015). Ford was under no duty to continue the Crib position when there was no longer a justifiable business need and Hoekstra has not argued that the termination of this position was unjustified. PRDSOF ¶¶ 21-22; *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010).

Finally, Hoekstra agrees that Ford was not obligated to remove another employee from their position or create a new job in order to accommodate Hoekstra. *Vargas v. DeJoy*, 980 F.3d 1184, 1189 (7th Cir. 2020) (employer is not "obligated to create light duty work for [an employee] where none existed."); *Gile*, 95 F.3d at 499 ("an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee. Nor is an employer obligated to create a 'new' position for the disabled employee."). Further, Hoekstra, as a member of the collective bargaining unit at the Chicago Plant, had "no right to superseniority" over members of the union with seniority. DSOF ¶¶ 4-5; Doc. [69], Hoekstra Dep. 25:11-16; *Cochrun*, 102 F.3d at 912-13 ("An employer is not required to violate the provisions of a collective

bargaining agreement to reassign a disabled employee pursuant to the ADA."); *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996). Thus, Hoekstra has offered no evidence that she could perform the essential functions of any vacant position at Ford. As a whole, Hoekstra fails to raise a genuine issue of material fact as to whether she is a "qualified individual" with a disability and whether Ford refused to make reasonable accommodations. Accordingly, the Court grants Ford's motion for summary judgment on Hoekstra's failure to accommodate claim.

### Count III: Retaliation

Hoekstra's final count alleges retaliation after engaging in the statutorily protected activity under Title VII of reporting alleged incidents of sexual harassment. Retaliation may be established by either the direct or indirect method. *Lewandowski v. City of Milwaukee*, 823 F. App'x 426, 429 (7th Cir. 2020). Hoekstra does not articulate her method of choice. Hoekstra also fails to advance any arguments on this count in her response brief regarding why it should survive and thus waives this claim. As the Seventh Circuit has stressed "perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *Rock Hemp*, 51 F.4th at 704. Her failure to address Ford's motion on the retaliation claim alone provides a basis for summary judgment.

Evaluating the claim on its merits also warrants summary judgment in Ford's favor. Ford asserts that Hoekstra failed to establish a retaliation claim under both the direct and indirect method. To establish retaliation under the direct method, Hoekstra must show: "(1) she engaged in activity protected by Title VII; (2) the [employer] took an adverse employment action;[16] and (3)

---

[16] Ford further contends that certain conduct are not adverse actions as they do not materially alter the terms and conditions of employment. *Stutler v. Illinois Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). The Court agrees. Changing the check-in meeting location for all employees, accidentally failing to close out time-records, and comments regarding potential adverse actions based on failure to meet attendance expectations do not constitute adverse employment actions. Thus, the Court focuses on the adverse action of placing Hoekstra on "no work available" leave.

there was a causal connection between the protected activity and the adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Ford only contests that Hoekstra failed to establish the causal connection. To show causation, an employer must show that the sexual harassment complaints were a motivating factor by either direct or circumstantial evidence. *Id.* at 860. Hoekstra has not put forward any direct or circumstantial evidence. The Court notes that Hoekstra was put on "no work available" leave in November 2021 only a few months after submitting her harassment complaint in August 2021. PRDSOF ¶¶ 29-30, 34-35, 59, 65. While temporal proximity can raise an inference of causal connection, the Seventh Circuit has noted there needs to be corroborating evidence of retaliatory motive or pretext. *Coleman*, 667 F.3d at 860-61; *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (Plaintiffs failed to "produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have.") (emphasis in original). Here, no evidence established retaliatory motive. Instead, the evidence shows, and Plaintiff agrees, that she was placed on "no work available" leave after her Crib assignment ended because the remaining daily tasks failed to justify a full-time hourly position. DSOF ¶ 22; PRDSOF ¶¶ 21, 28.

Ford further challenges the retaliation claim under the indirect, *McDonnell Douglas Corporation v. Green*, framework. 411 U.S. 792, 801 (1973). A plaintiff can establish a *prima facie* case for Title VII retaliation under *McDonnell Douglas* by showing: "(1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, the employer took an adverse action against her; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 926 (7th Cir. 2019). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant

to articulate a legitimate reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 801; *Rozumalski*, 937 F.3d at 926. After which the burden returns to the plaintiff to show that defendant's reason was pretextual. Ford notes that there were no comparators to Hoekstra because she was the only hourly employee in her role. However, there were other Crib employees who appeared to work in roles similar to Hoekstra. But the Court need not embark on this analysis, as further indicated below, because there was a legitimate business reason to eliminate the position and put Hoekstra on "no work available" leave.

Summary judgment on a Title VII retaliation claim is appropriate when a plaintiff does not dispute the legitimate business reason or provide any evidence that decision was pretextual. *See Ward v. First Fed. Savings Bank*, 173 F.3d 611, 619 (7th Cir. 1999). Hoekstra agrees that there was no longer a business need that justified a full-time hourly position in the Crib. DSOF ¶ 22; PRDSOF ¶ 21. Hoekstra also does not put forward any argument that Ford's stated rationale was pretextual and thus, has waived any argument. *See Rock Hemp*, 51 F.4th at 704. There is no evidence in the record that calls into question Ford's business motive or the fact that there were no other positions befitting Hoekstra's medical restrictions when she was placed on "no work available" leave. Even giving Hoekstra the benefit of the doubt on the *prima facie* case, no reasonable jury would be able to find a Title VII retaliation claim based on this record. Therefore, the Court grants Ford's motion for summary judgment on Count III.

## Conclusion

For these reasons, Defendant's motion for summary judgment [46] is granted on all counts. Judgment shall enter in favor of Defendant and against Plaintiff.[17]

---

[17] The Court notes that Plaintiff's response brief in this case was only four pages long and failed to address many of the arguments raised by Defendant. *Rock Hemp*, 51 F.4th at 704. Plaintiff's statement of facts also appeared to be in draft format with numerous citations left blank. *See* PRDSOF ¶ 9 "See her dep. At pgs __."; ¶ 20 "Disputed. See Hoekstra deposition at ___."; ¶ 27 "Disputed. Cite HH dep and R Taylor and

**SO ORDERED.**

Dated:  July 24, 2024

_____

Sunil R. Harjani

United States District Judge

---

earlier case."; ¶ 43 "Dep. of ___.." (cleaned up).  Some citations had inappropriate commentary. *See id.* at ¶ 30 "Admission that Ford waited till the end to seek to find her an eligible job – what crap" (cleaned up); ¶ 55 "True???."  Additionally, Plaintiff's statement of facts generally violated Local Rule 56.1(e)(3). *See id.* at ¶ 5 "Disputed.  The Rebecca Tayler [*sic*] letter to Hoekstra puts paid to this"; ¶ 6 "It is undisputed that Hoekstra was an hourly employee. The impact of the Taylor letter is unknown in this context"; ¶ 17 "Undisputed that the project took years; nothing about what Heather was doing"; ¶ 23 "Disputed. Then why did R Taylor assign HH to the Crib?"; ¶ 50 "Undisputed but Plaintiff notes that: "at the time" means that Ford did nothing to identify a job during the entire time they worked to eliminate her"; ¶ 56 "Disputed. The jobs that Plaintiff thought of were already filled or Pipkins told her that the jobs were not within her restrictions.  There was no 'independent' monitor to confirm his statements." (cleaned up).  While Plaintiff's counsel generally did a poor job in its submission, the Court has endeavored to evaluate the evidence to the best of its ability to reach the right result in this case. *Hildreth v. Butler*, 960 F.3d 420, 429-30 (7th Cir. 2020) ("[I]t is not the court's job to scour the record in search of evidence to defeat a motion for summary judgment.") (cleaned up).